IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LENNAR HOMES OF TEXAS SALES AND MARKETING, LTD., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-14-1094 |
| PERRY HOMES, LLC, | § § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lennar Homes of Texas Sales and Marketing, Ltd. ("Lennar") brought this copyright action against Perry Homes, LLC ("Perry") alleging that two of Perry's townhome designs infringe on Lennar's copyrighted works. Pending before the court is Defendant's Motion for Summary Judgment (Docket Entry No. 22). For the reasons stated below, Defendant's Motion for Summary Judgment will be granted, and this action will be dismissed.

## I.  Background

Lennar and Perry are competing homebuilders. In 2013 Lennar contracted to build townhomes in Phase I of Creekside Park, a development in the Woodlands, Texas.[1] Lennar built two models of townhomes in Phase I, the Burgundy and the Bordeaux.[2] Each model

---

[1]Declaration of Sam Teuton, Exhibit 4 to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No. 34-1, p. 131 ¶ 6.

[2]Id.

was a modified version of an earlier Lennar design.[3]  In July of 2013 The Woodlands put lots in Phase II of Creekside Park up for bid.[4]  Homebuilders had two weeks to submit their bids, including proposed floor plans and elevations.[5]  Perry did not have preexisting townhome designs that fit the developer's criteria.[6]  Perry therefore prepared new designs, including the Perry 2249 and the Perry 2255, to submit with its bid.[7]  Five days before the bids were due, Perry's architect visited Lennar's townhomes under construction in Phase I and reviewed floor plans of the Burgundy and Bordeaux obtained from Lennar's salespeople.[8]  Perry submitted its plans, won the bid, and began construction.  Lennar claims that Perry's 2249 and 2255 are infringing copies of the Burgundy and Bordeaux.  Lennar registered its designs with the Copyright Office, and this litigation ensued.

---

[3]See id. at 129-131 ¶¶ 3-5.

[4]See e-mail from Sue Dombos, The Woodlands (July 9, 2013), Exhibit 5 to Plaintiff's Response, Docket Entry No. 34-1, pp. 133-34; The Woodlands Lot Opportunity, Exhibit 6 to Plaintiff's Response, Docket Entry No. 34-1, p. 136; Deposition of William Robert "Billy" Shirley ("Shirley Deposition"), Exhibit 1 to Plaintiff's Response, Docket Entry No. 34-1, pp. 18-19.

[5]Shirley Deposition, Exhibit 1 to Plaintiff's Response, Docket Entry No. 34-1, pp. 18-19.

[6]Id. at 21.

[7]Id.

[8]Id. at 39-40; Perry's Answers to Lennar's First Set of Interrogatories ("Perry's Answers to Interrogatories"), Exhibit 18 to Plaintiff's Response, Docket Entry No. 34-2, pp. 22-23.

## II.  **Motion for Summary Judgment**

Perry has moved for summary judgment on multiple grounds. Primarily, Perry argues that Lennar's copyrights in the Burgundy and Bordeaux designs are invalid, that any similarity between Lennar's designs and Perry's is the fortuitous result of market conditions and developer's requirements, and that the elements of Lennar's designs that Perry is alleged to have copied are not protectable as a matter of law. Perry's invalidity arguments lack merit, and there is sufficient evidence in the record to raise a fact issue as to whether Perry copied Lennar's plans. However, even assuming that Perry copied Lennar's plans, any elements it copied were unprotectable as a matter of law, and Perry is entitled to summary judgment on Lennar's infringement claims.

### A.   **Standard of Review**

Summary judgment is appropriate if the movant establishes that there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986). The moving party is entitled to judgment as a matter of law if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has

the burden of proof." <u>Celotex Corp. v. Catrett</u>, 106 S. Ct. 2548, 2552 (1986).

A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not <u>negate</u> the elements of the nonmovant's case." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting <u>Celotex</u>, 106 S. Ct. at 2553). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." <u>Id.</u>  If, however, the moving party meets this burden, "the nonmovant must go beyond the pleadings" and produce evidence that specific facts exist over which there is a genuine issue for trial. <u>Id.</u> (citing <u>Celotex</u>, 106 S. Ct. at 2553-54). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 106 S. Ct. 1348, 1356 (1986).

"In order to avoid summary judgment, the nonmovant must identify specific facts within the record that demonstrate the existence of a genuine issue of material fact." <u>CQ, Inc. v. TXU Min. Co., L.P.</u>, 565 F.3d 268, 273 (5th Cir. 2009). "The party must also articulate the precise manner in which the submitted or identified evidence supports his or her claim. . . .  When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment,

-4-

that evidence is not properly before the district court." <u>Id.</u> (internal quotation marks and citation omitted).

In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 120 S. Ct. 2097, 2110 (2000). Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." <u>Little</u>, 37 F.3d at 1075.

## B.  Analysis

Under the Copyright Act, copyright protection subsists in "original works of authorship fixed in any tangible medium of expression."  17 U.S.C. § 102(a).  An architectural work is an original work of authorship, § 102(a)(8), and may be embodied in various media including "a building, architectural plans, or drawings."  § 101.  The holder of a copyright in an architectural work has the exclusive right to reproduce the work.  § 106.  Anyone who violates that exclusive right is an infringer of the copyright of the author, and the legal or beneficial owner of the exclusive right is entitled to sue for infringement.  § 501(a)-(b).

"To establish copyright infringement, a plaintiff must prove [1] ownership of a valid copyright and [2] copying of constituent elements of the work that are copyrightable." <u>Engineering</u>

-5-

Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335, 1340 (5th Cir. 1994) supplemented, 46 F.3d 408 (5th Cir. 1995). The first element, copyright ownership, is shown by (a) "proof of originality and copyrightability in the work as a whole" and (b) "compliance with applicable statutory formalities." Id. "To establish actionable copying (i.e., the second element), a plaintiff must prove: [a] factual copying and [b] substantial similarity. Positive Black Talk Inc. v. Cash Money Records, Inc., 394 F.3d 357, 367 (5th Cir. 2004), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 130 S. Ct. 1237 (2010). Factual copying may be established by direct evidence of copying, or it may be inferred from proof of access to the copyrighted work and "probative similarity" between the two works. Id. at 368. Substantial similarity is established by proof that the defendant's copying was legally actionable, i.e., that the defendant's work is substantially similar to protectable aspects of the original. See Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc., 783 F.3d 527, 550 (5th Cir. 2015).

1.   Ownership of Valid Copyright

"'To establish "ownership," the plaintiff must prove that the material is original, that it can be copyrighted, and that he has complied with statutory formalities.'" Aspen Technology, Inc. v. M3 Technology, Inc., 569 F. App'x 259, 268 (5th Cir. 2014) (unpublished) (quoting Lakedreams v. Taylor, 932 F.2d 1103,

1107-08 (5th Cir. 1991)).  In order to bring an infringement action a party must first register its work with the Copyright Office. 17 U.S.C. § 411(a).  "A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright." <u>General Universal Systems, Inc. v. Lee</u>, 379 F.3d 131, 141 (5th Cir. 2004); <u>see</u> § 410(c).[9]  "However, the presumption of validity and ownership that a certificate of registration creates is rebuttable." <u>Interplan Architects, Inc. v. C.L. Thomas, Inc.</u>, No. H-08-3181, 2010 WL 4366990, at *24 (S.D. Tex. Oct. 27, 2010).  "The effect of such a certificate is to place the burden of proof on the alleged infringer to disprove the validity of the copyright."  <u>Id.</u> (internal quotation marks and citation omitted).  Because Perry argues that Lennar's non-compliance with statutory formalities invalidates Lennar's copyright certificates, the court will first address that issue and then turn to the issues of originality and copyrightability.

    (a)  Compliance with Statutory Formalities

Perry argues that Lennar's copyright is invalid because the Burgundy and Bordeaux are derivative works -- based on preexisting Lennar designs -- and that Lennar failed to disclose that fact to

-------

[9]Once registered, "the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  § 410(c).

the Copyright Office.  "Accordingly," Perry contends, "the Court should decline to enforce the copyright without even looking to the disputed plans."[10]   Although its arguments are difficult to disentangle, Perry's Motion for Summary Judgment raises three threshold issues:  (i) whether failure to disclose the derivative nature of the Burgundy and Bordeaux designs invalidates their registrations; (ii) whether the court is required under § 411(2) to obtain an opinion from the Register of Copyrights as to the materiality of Lennar's failure to disclose;[11] and (iii) whether registration of a derivative work is sufficient to bring suit on the entire design, or only those elements that are new and unique to the derivative work.

### (i)   Lennar's registrations appear valid.

"A plaintiff complies with statutory formalities of copyright registration by submitting a complete application for registration, fee, and deposit to the Copyright Office."  Interplan, 2010 WL 4366990, at *24 (citing Geoscan, Inc. v. Geotrace Technologies, Inc., 226 F.3d 387, 393 (5th Cir. 2000)).  However, "[c]ourts may find a registration invalid if the copyright claimant willfully

---

[10]Defendant's Motion for Summary Judgment, Docket Entry No. 22, p. 16 ¶ 27.

[11]Perry has not argued this issue, but as discussed in Section B(1)(a)(ii) below, courts are required to obtain an opinion from the Copyright Office when a defendant alleges a failure to disclose information in a copyright application.

misstated or failed to state a fact that, if known, might have caused the Copyright Office to reject the copyright application." Berg v. Symons, 393 F. Supp. 2d 525, 542 (S.D. Tex. 2005); see also Lenert v. Duck Head Apparel Co. Inc., 99 F.3d 1136 (5th Cir. 1996) (unpublished). "There must be a showing of 'scienter' in order to invalidate a copyright registration." Interplan, 2010 WL 4366990, at *24 (citing St. Luke's Cataract & Laser Inst., P.A. v. Sanderson, 573 F.3d 1186, 1201 (11th Cir. 2009)). "[A] party seeking to prove fraud on the Copyright Office bears a 'heavy burden' in this regard." Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 7.20[B][1], at 7-212.4(5) (2015) (hereinafter Nimmer). Even if the inaccuracy was known, "plaintiff's failure to inform the Copyright Office of given facts is without substance[] to the extent that the Office would have registered the subject work even had it known those facts." Id.

Congress codified this court-made standard as part of the Prioritizing Resources and Organization for Intellectual Property Act of 2008 (the "PRO IP Act amendments"). See Act of Oct. 13, 2008, Pub. L. 110-403, Sec. 1(a), 122 Stat. 4256. Under the revised statute, a certificate of registration is sufficient to bring suit "regardless of whether [it] contains any inaccurate information," unless (1) the registrant included the inaccurate information "with knowledge that it was inaccurate" and (2) "the inaccuracy of the information, if known, would have caused the

Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(1).[12]

Perry argues that the Burgundy and Bordeaux are derivative works as defined in § 101 and that Lennar failed to disclose this information to the Copyright Office. Section 409 prescribes the information that must be included in an application for copyright registration. In the case of a derivative work, the applicant must include "an identification of any preexisting work or works that [the derivative work] is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered." § 409(9). Section 6 of copyright application Form VA requires applicants to identify any preexisting works upon which the derivative work is based and to describe the material that has been added.[13]

The Copyright Act defines "derivative work" as "a work based upon one or more preexisting works, [including any] form in which a work may be recast, transformed, or adapted." § 101. "A work consisting of editorial revisions, annotations, elaborations, or

---

[12]An en banc majority of the Federal Circuit has construed § 411(b)(1), albeit in dicta, as requiring "'but-for' materiality" to invalidate a federal registration of copyright. See Therasense, Inc. v. Becton, Dickinson and Co., 649 F.3d 1276, 1295 (Fed. Cir. 2011).

[13]See Form VA, Supplemental Exhibit B to Perry's Supplement to its Motion for Summary Judgment ("Perry's Supplement"), Docket Entry No. 28-2, pp. 3, 5.

other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'." Id.

According to Lennar, the Burgundy and Bordeaux are substantially modified versions of pre-existing Lennar designs used in various forms since 1998.[14] The Burgundy and Bordeaux would therefore appear to be derivative works as defined in § 101. Lennar argues that because it owns the preexisting designs on which the Burgundy and Bordeaux are based, the Burgundy and Bordeaux "are not derivative works under the Copyright Act."[15] The court is not persuaded. The fact that Lennar may own the underlying material is important to the scope of Lennar's copyright in the Burgundy and Bordeaux designs.[16] However, it does not mean that the Burgundy and Bordeaux are not "derivative works" as defined in § 101. Lennar points to no provision of the Copyright Act that creates such an exception. Lennar cites a Fourth Circuit case that is factually analogous and appears, at first glance, to support its position. See Christopher Phelps & Assocs., LLC v. Galloway,

---

[14]See Plaintiff's Response, Docket Entry No. 34, pp. 8-11.

[15]Id. at 17.

[16]See § 103(b) ("The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.").

492 F.3d 532, 538 (4th Cir. 2007) ("The Bridgeford Residence [based
on plaintiff's preexisting designs] was not a derivative work as
defined in the Copyright Act").   However, the quoted language from
Galloway is broader than the actual holding in that case.
Specifically, the court in Galloway held that because the plaintiff
owned the underlying work, its copyright extended to the entire
design, not just the newly added material.   See id. at 539.   It
would therefore appear that the quoted language refers to § 103,
which defines the scope of protection in a derivative work, not
§ 101, which defines the term "derivative work."   See id. at 538
(citing § 103 and stating that its limitations do not apply "when
the author of the derivative work also has a copyright on the
underlying work" (emphasis added)).   Lennar cites no other
authority for the proposition that the Burgundy and Bordeaux are
not derivative works as defined in § 101, and the court is not
aware of any.[17]

Lennar also points to cases concluding that the disclosure
requirement in § 409(9) does not apply where the registrant owns
both the underlying work and the derivative work.[18]   See Frank Betz
Associates, Inc. v. J.O. Clark Const., L.L.C., No. 3:08-CV-00159,

_____

[17]Furthermore, the substantial case law addressing registration
requirements when the owner of a derivative work also owns the
underlying material would be nonsensical if such works were not in
fact "derivative works."   See infra section II(B)(1)(a)(iii).

[18]Plaintiff's Response, Docket Entry No. 34, p. 17.

-12-

2010 WL 2253541, at *11 (M.D. Tenn. May 30, 2010) ("The issue raised by § 409(9) is whether and to what extent the derivative design incorporates elements designed by someone else."); Dorchen/Martin Associates, Inc. v. Brook of Cheboygan, Inc., No. 11-10561, 2012 WL 4867608, at *5 (E.D. Mich. Oct. 15, 2012) ("Where the evidence indicates that Plaintiff created derivative designs based on its own original designs, 'the concerns that § 409(9) raises are not implicated.'" (quoting Frank Betz Associates, 2010 WL 2253541, at *11)).

However, as one commentator has observed, "courts confuse the disclosure requirements of Space 6 with originality or infringement issues, or worse, with both."   5 William F. Patry, Patry on Copyright § 17:112 (2015).   Even if the registrant owns both the derivative work and the underlying work, § 409(9) still requires disclosure:

> The Copyright Office forms and instructions contain no such exception, and such an exception would make no sense from a policy standpoint.  The purpose of disclosure on Space 6 is twofold: to permit the Copyright Office to determine whether the new material is sufficient to support the derivative registration, and to place on the public record a clean separation of the original, preexisting work from the derivative work so that copyright in the original work is not impermissibly extended through successive registrations for undisclosed variations.  In fact, contrary to [cases holding that a common owner need not disclose prior works], this latter policy is particularly undermined by a common owner.  Accordingly, [such cases] should not be followed.

Id.

The court concludes that the Burgundy and Bordeaux designs are derivative works as defined in § 101 and that § 409 and Space 6 required disclosure of that fact.  Lennar registered the Burgundy and Bordeaux designs before bringing this action.[19]   It is undisputed that Lennar did not identify the Burgundy and Bordeaux as derivative works in its applications to the Copyright Office.[20] These applications therefore contained inaccurate information.

Nevertheless, even if Lennar was required to disclose the derivative nature of its designs -- and even assuming its failure to do so was knowing -- any such failure appears to have been immaterial.  "In general, failure to disclose that the registered work is derivative of an earlier, underlying work should occasion rejection of the registration certificate only if the claimant was for some reason ineligible to register the derivative work." Nimmer § 7.20[B][1], at 7-212.4(8)(a).[21]   As discussed in the

---

[19]See Certificate of Registration No. VA 1-893-104, Burgundy Townhome Design, Exhibit A to Second Amended Complaint, Docket Entry No. 17-1, pp. 1-2; Supplementary Certificate of Registration No. VA 1-433-693, Burgundy Townhome Design, Exhibit B to Second Amended Complaint, Docket Entry No. 17-1, pp. 3-4; Certificate of Registration No. VA 1-893-105, Bordeaux Townhome Design, Exhibit C to Second Amended Complaint, Docket Entry No. 17-1, pp. 5-6; Supplementary Certificate of Registration No. VA 1-433-694, Bordeaux Townhome Design, Exhibit D to Second Amended Complaint, Docket Entry No. 17-1, pp. 7-8.

[20]See Plaintiff's Response, Docket Entry No. 34, pp. 17-20; Applications, Supplemental Exhibit F to Perry's Supplement, Docket Entry No. 28-6, pp. 4-7.

[21]Other authority Lennar cites for the proposition that its
(continued...)

following subsection, there is sufficient evidence to raise a fact question as to whether Lennar owned the pre-existing works on which the Burgundy and Bordeaux designs were based.   Perry offers no evidence that Lennar did not author the underlying works and no authority to suggest that the Copyright Office would have refused to register the Burgundy and Bordeaux designs had it known that they were based in part on Lennar's own preexisting material.[22]

---

[21](...continued) works are not derivative in fact supports this narrower proposition.  See Cannon Group, Inc. v. Better Bags, Inc., 250 F. Supp. 2d 893, 899 (S.D. Ohio 2003) ("[B]ecause the copyright in a derivative work is independent from the copyright for preexisting work, the copyright office would have nevertheless granted BBI's registration.").

[22]Because Perry's cited authorities all involve works that incorporated preexisting material owned by someone other than the registrant, they address originality concerns not raised in this case.  See Lenert, 99 F.3d at *3–*4 ("[T]he omission of the work's derivative nature deprives the Copyright Office of the opportunity fully to evaluate the application; and the derivative work is protected only to the extent of the new material contained in the derivative work."); GB Mktg. USA Inc. v. Gerolsteiner Brunnen GmbH & Co., 782 F. Supp. 763, 774 (W.D.N.Y. 1991) ("The rationale behind this rule is simple: although the court would ordinarily defer to the judgment of the Copyright Office when the question of originality is a close one, that is impossible to do when the Copyright Office has not had a fair opportunity to pass on the question . . . ."); Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc., 482 F. Supp. 980, 988 (S.D.N.Y. 1980) ("Where as here the question of originality is a close one, a decision to grant or deny protection made in the first instance by the [Copyright Office] would have been highly persuasive . . . , however the Copyright Office had no opportunity to pass on plaintiff's claim accurately presented.").

Therefore, Perry's fraud on the Copyright Office argument appears to lack merit.[23]

> **(ii)    Section 411(b)(2) mandates referral of the materiality question to the Register of Copyrights; however, the issue is moot.**

When Congress amended the Copyright Act in 2008 to include specific grounds for invalidation of a registration in § 411(b)(1), it also added § 411(b)(2), which states:

> In any case in which inaccurate information described under paragraph (1) is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration.

Perry has not identified -- and the court is not aware of -- any reason that the Copyright Office would decline to register Lennar's designs had it known of their derivative nature. Nevertheless, referral of the issue does not appear to be

---

[23]The knowledge and but-for causation requirements codified in § 411(b) apply only to invalidation with respect to "institution of and remedies in infringement actions under [section 411] and section 412." See § 411(b)(3); id. ("[A] certificate of registration satisfies the requirements of [section 411] and section 412, regardless of whether the certificate contains any inaccurate information . . ."). Accordingly, a "tight reading" of the revised § 411 preserves prior case law applying a more liberal standard to section 410(c), which governs the prima facie presumption of validity accorded a certificate of registration. Nimmer, § 7.20[B][1], at 7-212.4(5) nn.25.2, 25.3; Therasense, 649 F.3d at 1316 n.4 (Bryson, J., dissenting). Therefore, with respect to the presumption of validity, Perry could argue that it need only show that Lennar's omission "might" have caused the Copyright Office to reject Lennar's application. The court need not address the issue in detail, however, as Perry has failed to satisfy even this more liberal standard.

discretionary.   In the only appellate decision that has addressed § 411(b)(2) in depth, the Seventh Circuit held that a court "must request a response from the Register before coming to a conclusion as to the materiality of a particular misrepresentation." DeliverMed Holdings, LLC v. Schaltenbrand, 734 F.3d 616, 624 (7th Cir. 2013).  The court's holding was not without reservation, however.  "Given its obvious potential for abuse, we must strongly caution both courts and litigants to be wary of using this device in the future." Id. at 625.  Before a court refers a case to the Copyright Office, the party seeking invalidation should demonstrate that "(1) the registration application included inaccurate information; and (2) the registrant knowingly included the inaccuracy in his submission to the Copyright Office." Id.

Because the court ultimately concludes that summary judgment should be granted on the issue of substantial similarity, it need not further address the referral issue.  Nevertheless, it would be prudent for Lennar to file supplemental registrations, identifying the Burgundy and Bordeaux designs as derivative works and providing all other information required under § 409(9) and the application form.

### (iii) Registration of the Burgundy and Bordeaux designs is sufficient to bring suit on elements shared with underlying works.

Although copyright registration is a prerequisite to suit for infringement, copyright ownership inheres automatically at the time

-17-

of creation.  See §§ 102(a), 408(a); Harper & Row Publishers, Inc. v. Nation Enterprises, 105 S. Ct. 2218, 2223 (1985); Nimmer §§ 716[A][1], [B][1].  Where the owner of a derivative work also owns the underlying work on which the derivative work is based, registration of the derivative work alone is sufficient to bring suit for infringement of elements contained in both.  E.g., Galloway, 492 F.3d at 539 ("While Phelps & Associates only registered the Bridgeford Residence design, that registration satisfied the prerequisite for suit under 17 U.S.C. § 411 for the *entire design*, even though some of it was created earlier in the form of the Bell and Brown Residence design."); Aspen Tech., 569 F. App'x at 269 ("This position has been recognized by at least five circuits and by district courts in two others." (citations omitted)); accord Patry § 17:89; Nimmer § 7.16[B][5][c]; see also id. at n.332 ("[However,] [t]he assumption is that the derivative work that is registered embodies all the features of the underlying work on which suit is premised.").[24]

---

[24]Some case law suggests that disclosure of the preexisting works may be required to proceed based on a single registration. See, e.g., Oravec v. Sunny Isles Luxury Ventures, L.C., 527 F.3d 1218, 1230 (11th Cir. 2008).  Because Perry argues that registration of a derivative work is never sufficient to sue on the underlying material, it has not raised this more nuanced argument. Nevertheless, it is not clear that such a rule should apply in this case, and if Lennar were to file supplemental registrations, that could resolve the matter.

Perry refers to this as a "bizarre 'register all the plans at once' theory,"[25] but cites no genuinely contrary authority.  Perry argues that Lennar should "only be able to bring suit upon the protected elements of the derivatives; <u>i.e.</u>, those few new elements that are original to the Burgundy and Bordeaux designs and <u>not</u> contained in the prior works."[26]  Perry provides quotes that appear to support its position,[27] but the quotes are either taken out of context, <u>see</u> 1 Howard B. Abrams, <u>The Law of Copyright</u> § 10:18, or dicta from a distinguishable unpublished Fourth Circuit per curiam opinion issued twenty years ago, <u>see Cramer v. Crestar Financial Corp.</u>, 67 F.3d 294, at *4 (4th Cir. 1995).  The one Fifth Circuit case Perry cites is entirely reconcilable with the established rule.  <u>See Creations Unlimited, Inc. v. McCain</u>, 112 F.3d 814, 816 (5th Cir. 1997) (holding that district court did not err in comparing infringing work to plaintiff's registered line drawings because plaintiff's t-shirts -- presumably derivative of the registered line drawings -- were not registered).  That the "Copyright Act requires authors to register derivative works separately from the originals,"[28] does not bar a common-owner

---

[25]Perry's Reply in Support of Its Motion for Summary Judgment ("Perry's Reply"), Docket Entry No. 41, p. 11 ¶ 19.

[26]<u>Id.</u> at 8 ¶ 13.

[27]<u>See id.</u> ¶¶ 12-13.

[28]<u>Id.</u> at 7 n.10.

plaintiff from suing on elements of unregistered originals contained in a registered derivative work. E.g., Murray Hill Publications, Inc. v. ABC Communications, Inc., 264 F.3d 622, 632 (6th Cir. 2001), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 130 S. Ct. 1237 (2010) ("Because a derivative work is cumulative of the earlier work, it is logical that the registration of the derivative work would relate back to include the original work, while registration of the original material would not carry forward to new, derivative material.").[29]  Though unpublished, the Fifth Circuit's opinion in Aspen Tech., 569 F. App'x at 269, which Perry fails to cite, is on point and directly refutes Perry's position.[30]

The president of Lennar's Houston Division, Donald A. Luke, testified that the Burgundy and Bordeaux designs are the fourth iteration of a townhouse Lennar independently designed and has been building for approximately fifteen years.[31]  Lennar did not register

---

[29]Compare Nimmer § 7.16[B][5][b], Registration Only of Underlying Work, with id. § 7.16[B][5][c], Registration Only of Derivative or Collective Work.

[30]After expending substantial effort reviewing the relevant authorities and finding that they overwhelmingly support Lennar's position, the court views Perry's argument as bordering on frivolous.

[31]Oral and Videotaped Deposition of Donald A. Luke ("Luke Deposition"), Exhibit H to Defendant's Motion for Summary Judgment, Docket Entry No 22-1, pp. 176-82.

any of the preexisting design iterations.[32]   However, Lennar did register the Burgundy and Bordeaux designs.[33]   Lennar therefore has satisfied § 411(a)'s registration requirement with respect to the entire Burgundy and Bordeaux designs, including those elements derived from Lennar's own preexisting works.

Independent of the registration-as-precondition-to-suit issue, Perry argues that Lennar is barred from enforcing its copyrights in the preexisting material simply because Lennar incorporated that material into derivative works.[34]   Perry is wrong.   See Galloway, 492 F.3d at 538-39 (holding that trial court erred in instructing jury that scope of common owner's copyright consisted only of the minimal difference between underlying and derivative designs). Perry cites no authority that would support such a rule, and, absent evidence of invalid copyright in the underlying work, such a rule would be nonsensical as a policy matter.

---

[32]Declaration of Robert P. Nicks, Exhibit B to Plaintiff's Motion for Protective Order, Docket Entry No. 26-1, p. 8 ¶ 8.

[33]Id. at 7 ¶ 6.

[34]See Defendant's Motion for Summary Judgment, Docket Entry No. 22, p. 16 ("What remains of Lennar's copyrights to the Burgundy and Bordeaux are trivial, unprotectable changes in design." (emphasis added)); Defendant's Additional Briefing on Non-Protected Elements, Docket Entry No. 72, p. 9 n.13 ("Of course, Perry contends that only those changes made to the derivative work are even possibly protected by copyright . . . ."). The court's analysis of this argument overlaps significantly with the registration issue, so much so that it may be superfluous, but given implications for the substantial similarity analysis below, the court will address it explicitly.

It is true that the copyright in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work," § 103(b). This limitation stems from the "fundamental principal that only that which is original with the copyright proprietor or his assignor may be protected by his copyright." Nimmer, 3.04[A], at 3-22.10(1).[35]  However, the copyright in the derivative work "does not affect" the ownership or subsistence of copyright protection in the preexisting material.  § 103(b).  Therefore, "[a]ny elements that the author of the derivative work borrowed from the underlying work . . . remain protected by the copyrights in the underlying work." Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1112 (1st Cir. 1993); accord Nimmer, § 3.05, at 3-34.30 n.2.1.  Thus, even if the infringer copies underlying material only from the derivative work, the copyright owner of the underlying material has a cause of action against the infringer. Montgomery v. Noga, 168 F.3d 1282, 1292-93 (11th Cir. 1999); accord Nimmer § 3.05, at 3-34.31; cf. Richmond Homes Mgmt., Inc. v.

---

[35]Thus, copyright in a derivative work "does not imply any exclusive right in the preexisting material," § 103(b).  That is to say, the owner of a derivative-work copyright does not by virtue of that copyright alone acquire rights in the underlying works. Likewise, the copyright in a derivative work does not "enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material." Id.  "Thus, the copyright owner of the underlying work does not as such become the copyright owner of the material added in a [derivative] work incorporating such underlying work."  Nimmer, § 3.04[A], at 3-22.9 n.4.

-22-

Raintree, Inc., 66 F.3d 316 (4th Cir. 1995) ("Because RHMI cannot assert the [underlying] copyright, it may claim damages based solely on the aspects of the Louisa 'distinguished from the preexisting material employed in the work.'" (emphasis added) (quoting § 103(b))). A contrary rule would frustrate the central purposes of intellectual property law, i.e., the promotion of innovation and the arts, because authors would be deterred from creating or licensing derivative works for fear of losing protection in their existing material. Assuming Lennar is the copyright owner of the underlying material incorporated into the Burgundy and Bordeaux designs, Lennar may enforce its copyright in that underlying material against a party that copies it from the derivative designs.

In a last ditch effort, Perry argues that even if Lennar is also entitled to sue on elements of the underlying works, "Lennar has not produced any tangible evidence that it actually owns the original [designs]."[36] Even though Donald Luke testified that he was personally involved in the design process over the course of fifteen years and that each iteration of the design was done entirely in-house,[37] Perry argues that "Lennar must provide more

---

[36]Perry's Reply, Docket Entry No. 41, pp. 9-10.

[37]See, e.g. Luke Deposition, Exhibit H to Defendant's Motion for Summary Judgment, Docket Entry No 22-1, p. 182 ("Q: We're on the fourth [iteration]. A: Sure. Q: I was just making sure I have all the iterations. A: They are, but they all come from -- from my
(continued...)

than the word of one of its employees to create a jury question."[38]
The court is not persuaded.    Perry's cited authority is
distinguishable,[39] and determining whether or not Luke's testimony
is to be credited is the role of a jury.


    (b)   Originality and Copyrightability

    Perry appears to concede that if registration of the Burgundy
and Bordeaux designs alone is sufficient to bring suit, the only
remaining validity issues are whether Lennar in fact owns the
underlying works, i.e., whether the prior iterations were original
to Lennar,[40] and whether the works as a whole are copyrightable.[41]

---

[37](...continued)
-- from my brain."); id. ("Q: Okay. Were any -- any outside
architects or designers involved in any of them? A: No.  Q: Even
the original one?  A: Even the original.").

[38]Perry's Reply, Docket Entry No. 41, p. 9 ¶ 15.

[39]See Psihoyos v. Pearson Educ., Inc., 855 F. Supp. 2d 103,
117-18 (S.D.N.Y. 2012) (granting summary judgment over non-movant's
objections because "stray testimony" inconsistent with movant's
argument was merely "speculative evidence" insufficient to create
a genuine fact issue); Corwin v. Quinonez, 858 F. Supp. 2d 903,
911 (N.D. Ohio 2012) (holding that conclusory allegations in
plaintiff's affidavit were insufficient to create fact issue where
allegations lent no support to factual assertions in the complaint
that were directly refuted by defendant's evidence).

[40]Perry's Reply, Docket Entry No. 41, pp. 9-10 ¶¶ 15, 18-19.

[41]See generally Defendant's Motion for Summary Judgment, Docket
Entry No. 22, pp. 17-25 ("Lennar Cannot Own Layouts Dictated by
Functional Necessity").  Perry's originality arguments are inter-
twined with its arguments about the scope of Lennar's protection in
the Burgundy and Bordeaux designs.   The court will address
(continued...)

"To qualify for copyright protection, a work must be original to the author." Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 111 S. Ct. 1282, 1287 (1991). The threshold for originality is low. It requires only "that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Id. Novelty is not required. Id. "[T]he requisite level of creativitiy is extremely low; even a slight amount will suffice." Id. "Practically speaking, because the degree of creativity required is so low, the originality requirement amounts to 'little more than a prohibition of actual copying.'" Axelrod & Cherveny Architects, P.C. v. Winmar Homes, No. 2:05-CV-711-ENV-ETB, 2007 WL 708798, at *9 (E.D.N.Y. March 6, 2007) (quoting Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99, 103 (2d Cir. 1951)).

Nevertheless, "[t]here remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent." Feist, 111 S. Ct. at 1294. For example, the Supreme Court in Feist held that the alphabetical arrangement of names in a telephone directory was not sufficiently original because arranging names alphabetically is an "age-old practice, firmly rooted in tradition and so commonplace that it has come to be expected as a matter of course." Id. at 1297.

---

[41] (...continued)
originality for validity purposes separately from scope of protection for substantial similarity purposes.

Where the defendant challenges the originality of copyrighted material, the presumption of validity will not be overcome unless the defendant offers either (1) proof that the product was copied from other works or (2) "similarly probative evidence as to originality." <u>Masquerade Novelty, Inc. v. Unique Industries, Inc.</u>, 912 F.2d 663, 668-69 (3d Cir. 1990).

Perry presents no evidence that Lennar copied the Burgundy or Bordeaux designs -- or the underlying material -- from other works not owned by Lennar.  And Lennar presents unrebutted evidence that all of the design work was done in-house by Lennar employees.  Even if due to the unresolved registration issues in this case Lennar were not entitled to a presumption of validity regarding the underlying works, Lennar has presented sufficient evidence to raise a fact issue as to whether it authored them.  Furthermore, apart from the derivative work issues addressed above, the Copyright Office had an opportunity to pass on the copyrightability of Lennar's designs as a whole, and it issued registrations.

Although intertwined with the issue of substantial similarity addressed below, Perry's other arguments against originality and copyrightability raise two distinct issues:  (i) whether the changes embodied in the Burgundy and Bordeaux are sufficient to copyright those designs, and (ii) whether the designs as a whole are sufficiently original to copyright.

> **(i)    Originality is not limited to differences between the derivative and underlying works.**

Perry argues that the Burgundy and Bordeaux designs are not sufficiently original because "[t]rivial changes to a derivative work are not copyrightable."[42]   This argument is a red herring. Perry persists in relying on the entirely unsupported proposition that Lennar's enforceable copyright in the Burgundy and Bordeaux is limited to the differences between those designs and their immediate predecessors.   For the reasons discussed at length above, this is incorrect.   Furthermore, Perry's argument defies common sense.   If, as Perry argues, the changes embodied in the Burgundy and Bordeaux designs are too insignificant to distinguish those designs from the underlying works,[43] then what Lennar has copyrighted are the underlying works themselves.   Making all reasonable inferences in favor of Lennar, the court assumes that Lennar authored the underlying works on which the Burgundy and Bordeaux designs are based, and the proper inquiry is whether the designs as a whole are sufficiently original to be accorded copyright protection.

---

[42]Defendant's Motion for Summary Judgment, Docket Entry No. 22, p. 6 ¶ 3.

[43]See id. at 16–17.

> **(ii)   Despite any limitations imposed by market demands or development criteria, there is sufficient evidence to raise a fact question on originality and copyrightability of the works as a whole.**

Apart from its derivative-work related arguments, Perry raises no other explicit objections to the originality and copyrightability of Lennar's plans for _validity_ purposes.[44] Nevertheless, Perry argues obliquely that "the designs represented the only way to design a townhouse that both met market expectations and complied with the Creekside and The Woodlands' rules governing the construction process."[45]   Perry argues that "[s]ince those elements cannot be copyrighted, Lennar has no copyright on its designs for the Burgundy and Bordeaux."[46]   The substance of Perry's arguments on this point, however, addresses only the scope of Lennar's copyright for substantial similarity purposes.[47]   To the extent Perry argues that the Burgundy and Bordeaux designs are not original or copyrightable because the layouts were dictated by functional demands, Perry does not cite a single case finding a copyright invalid on these grounds.

---

[44]_See, e.g._, _id._ at 17 ¶ 31 ("Putting aside Lennar's copyright problems . . . ."); Perry's Reply, Docket Entry No. 41, p. 10 ¶ 16 ("Based on the above, Lennar has not and cannot make out the prima facie case of copyright ownership . . . .").

[45]Defendant's Motion for Summary Judgment, Docket Entry No. 22, pp. 17-18 ¶ 31.

[46]_Id._ at 25 ¶ 48.

[47]_See_ _id._ at 18-25.

Furthermore, Perry stresses elsewhere that there are "no fewer than 65 substantive differences" between Lennar's design and Perry's, rendering them "profoundly different" from one another.[48]   Perry states that "[w]hile the designers of Perry's and Lennar's townhouses had almost no flexibility when it came [to] the layout of the major features, they did have discretion with regard to the details."[49]   If that is the case, then the 65 highlighted differences are 65 ways in which Lennar's designs are original despite the constraints imposed.   Perry has failed to rebut the presumption of validity of Lennar's designs.   Even if Lennar were not entitled to a presumption of validity, Perry has failed to make a sufficient showing on summary judgment, as there is ample evidence in the record to create a fact issue on originality. Cf. Danze & Davis Architects, Inc. v. Legend Classic Homes, Ltd., No. H-10-0216, 2011 WL 2940671, at *5 (S.D. Tex. July 19, 2011) (granting partial summary judgment to plaintiff on validity despite similar arguments from defendant); KB Home v. Antares Homes, Ltd., No. 3-04-CV-1031-L, 2007 WL 1893370, at *7 (N.D. Tex. June 28, 2007) (same); Axelrod & Cherveny, 2007 WL 708798, at *11 (same).

---

[48]Id. at 7 ¶ 6, 10 ¶ 13.

[49]Id. at 10 ¶ 13.

2.   Copying

To prove actionable copying a plaintiff must make two showings. "First, the plaintiff must, as a factual matter, prove that the defendant actually used the copyrighted material to create his own work." General Universal Systems, Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004) (internal quotation marks and citation omitted). "If the plaintiff demonstrates factual copying, he must next demonstrate that the copying is legally actionable by showing that the allegedly infringing work is substantially similar to protectable elements of the infringed work.[50]   A side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'"   Id.

(a)   Factual Copying

Factual copying is generally established by proof of (1) the defendant's access to the plaintiff's work before creation of the infringing work and (2) probative similarity between the two works. Gen. Universal, 379 F.3d at 141-42. "The access element is satisfied if the person who created the allegedly infringing work had a reasonable opportunity to view the copyrighted work. The second element -- probative similarity -- requires a showing that

---

[50]As between "protectable" and "protectible," the court prefers the former, and it uses the latter only to maintain accurate quotations.

the works, when compared as a whole, are adequately similar to establish appropriation." <u>Id.</u>

When comparing works "as a whole," the question is not whether "the whole of the defendant's work largely replicates the allegedly copied work," but rather "the jury must consider the whole of the first work (including both copyrightable and non-copyrightable parts) and the whole of the second work and then compare the two works, looking for any similarities between their constituent parts." <u>Positive Black Talk</u>, 394 F.3d at 370-71.

Perry does not explicitly address factual copying in its briefing apart from a single sentence in the summary of its argument.[51] There is sufficient evidence to create a fact issue on this element. It is undisputed that Perry's employees had access to Lennar's designs. While Perry was preparing its bid for Phase II of Creekside Park, a Perry employee contacted Lennar's salespeople and obtained floor plans of the Burgundy and Bordeaux.[52] Those plans were circulated to Perry's architect, who, the same day, also visited and photographed Lennar's townhomes under

_____

[51]<u>See</u> Defendant's Motion for Summary Judgment, Docket Entry No. 22, p. 12 ¶ 16 ("[T]he evidence unequivocally demonstrates that [Perry's architect] drew (by hand) Perry's allegedly infringing designs onto 'butter paper' using an architect's scale before he ever laid eyes on the designs of the Burgundy and Bordeaux townhouses."). Perry does not cite any record evidence in support of this proposition, and the remainder of its briefing addresses only substantial similarity and validity-related arguments.

[52]<u>E.g.</u>, Shirley Deposition, Exhibit 1 to Plaintiff's Response, Docket Entry No. 34-1, pp. 68-71.

construction.[53]   During discovery Perry averred that its architect
completed a draft of the Perry designs on paper prior to reviewing
Lennar's plans.[54]   At his deposition Perry's architect could not
recall when he finished his paper drawings, but he believed it was
the same afternoon he visited Lennar's townhomes and received
Lennar's plans by e-mail.[55]   The credibility of Perry's evidence is
a jury a question.   As to "probative similarity," a cursory review
of the Lennar and Perry floor plans reveals numerous similarities
in layout and arrangement.[56]   There is sufficient evidence in the
record to create a triable issue on factual copying.

        (b)   Substantial Similarity

        "Not all copying, however, is copyright infringement."   Feist,
111 S. Ct. at 1289.   "To determine whether an instance of copying
is legally actionable, a side-by-side comparison must be made
between the original and the copy to determine whether a layman

------------------------------------------------------------

        [53]E.g., Deposition of Charles Dickson ("Dickson Deposition"),
Exhibit 7 to Plaintiff's Response, Docket Entry No. 34-1,
pp. 67-68; Perry's Answers to Interrogatories, Exhibit 18 to
Plaintiff's Response, Docket Entry No. 34-2, pp. 22-23.

        [54]Perry's Answers to Interrogatories, Exhibit 18 to Plaintiff's
Response, Docket Entry No. 34-2, pp. 24-25.

        [55]See Dickson Deposition, Exhibit 7 to Plaintiff's Response,
Docket Entry No. 34-1, pp. 154-55.

        [56]Copies of the relevant plans are attached to this Memorandum
Opinion and Order as an appendix.   See also Dickson Deposition,
Exhibit 7 to Plaintiff's Response, Docket Entry No. 34-1, pp.
182-84 (reviewing similarities between the plans).

would view the two works as 'substantially similar.'" <u>Positive Black Talk</u>, 394 F.3d at 374 (internal quotation marks and citation omitted).  "To support a claim of copyright infringement, the copy must bear a substantial similarity to the <u>protected aspects</u> of the original." <u>Peel & Co., Inc. v. The Rug Market</u>, 238 F.3d 391, 398 (5th Cir. 2001) (emphasis added); <u>see also</u> <u>Zalewski v. Cicero Builder Dev., Inc.</u>, 754 F.3d 95, 101 (2d Cir. 2014) ("For clarity, the term 'substantial similarity' is properly reserved for similarity that exists between the protected elements of a work and another work."). Therefore, "[t]he inquiry focuses not on every aspect of the copyrighted work, but on those aspects of the plaintiff's work [that] are protectible under copyright laws and whether whatever copying took place appropriated those [protected] elements." <u>T-Peg, Inc. v. Vermont Timber Works, Inc.</u>, 459 F.3d 97, 112 (1st Cir. 2006) (internal quotation marks and citations omitted).  "[A]nyone may copy uncopyrightable elements in a copyrighted work." <u>Eng'g Dynamics</u>, 26 F.3d at 1347.  Given these limitations, "where the copyrighted work contains unprotectable elements, the first step is to distinguish between protectable and unprotectable elements of the copyrighted work." <u>Nola Spice</u>, 783 F.3d at 550.[57]  Once unprotectable elements are excluded, "the next

---

[57]<u>See also</u> <u>Peel & Co.</u>, 238 F.3d at 398 (reversing summary judgment where evidence raised fact issues on, *inter alia*, protectability of constituent elements of plaintiff's work); <u>Kepner-Tregoe, Inc. v. Leadership Software, Inc.</u>, 12 F.3d 527, (continued...)

inquiry is whether the allegedly infringing work bears a substantial similarity to the protectable aspects of the original work." Id. This second inquiry is performed from the perspective of a layman or ordinary observer. Id.

"Typically, the question whether two works are substantially similar should be left to the ultimate factfinder, but summary judgment may be appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the nonmoving party, that no reasonable juror could find substantial similarity of ideas and expression." Gen. Universal, 379 F.3d at 142 (internal quotation marks and citation omitted). Summary judgment is also appropriate where "similarity between two works concerns only non-copyrightable elements of the plaintiff's work." Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1247 (11th Cir. 1999) (quoted with approval by Gen. Universal, 379 F.3d at 142 n.142); see Kepner-Tregoe, 12 F.3d at 533 ("Thus, if we conclude that [defendant] only copied unprotectable elements of [plaintiff's] materials, we must reverse the district court's judgment [in favor of plaintiff].").

---

[57](...continued)
533-34 (5th Cir. 1994) ("To determine the scope of copyright protection in a close case, a court may have to filter out ideas, processes, facts, idea/expression mergers, and other unprotectable elements of plaintiff's copyrighted materials to ascertain whether the defendant infringed protectable elements of those materials.").

Summary judgment therefore is appropriate if -- after filtering out unprotectable elements of Lennar's designs -- (1) no reasonable jury could find substantial similarity between the remaining protectable elements of Lennar's designs and Perry's designs, or (2) there are no remaining similarities between the designs.

> **(i)   Not all aspects of a copyrighted work are protectable; copyright only protects the constituent elements of a work that are original to the author.**

"The mere fact that a work is copyrighted does not mean that every element of the work may be protected." <u>Feist</u>, 111 S. Ct. at 1289. "'The copyright is limited to those aspects of the work -- termed "expression" -- that display the stamp of the author's originality.'" <u>Kepner-Tregoe</u>, 12 F.3d at 533 (quoting <u>Harper & Row</u>, 105 S. Ct. at 2224). Infringement therefore requires "copying of constituent elements of the work that are original." <u>Feist</u>, 111 S. Ct. at 1296.

Under the Copyright Act, an architectural work "includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101. This excludes from protection "[s]tandard configurations of spaces," 37 C.F.R. § 202.11(d)(2), as well as "common windows, doors, and other staple building components," H.R. Rep. No. 101-735, <u>reprinted in</u> 1990

U.S.C.C.A.N. 6935, 6949. However, individual features that "reflect the architect's creativity" are not excluded. Id.

More generally, limitations imposed by traditional copyright doctrines -- such as idea/expression dichotomy and scènes-à-faire -- apply to architectural works as well. Zalewski, 754 F.3d at 105. No author may copyright facts or ideas, only the expression of those facts and ideas. Feist, 111 S. Ct. at 1290; see 17 U.S.C. § 102(b).[58] Such expression is protectable, "as long as that expression is original and not dictated by the underlying idea." Nola Spice, 783 F.3d at 551. "The guiding consideration in drawing the line between an idea and its expression is the preservation of the balance between competition and protection reflected in the patent and copyright laws." Kern River Gas Transmission Co. v. Coastal Corp., 899 F.2d 1458, 1463 (5th Cir. 1990) (internal quotation marks, alteration, and citation omitted). Therefore, "when an idea can be expressed in very few ways, copyright law does not protect that expression, because doing so would confer a de facto monopoly over the idea. In such cases idea and expression are said to be merged." Kepner-Tregoe, 12 F.3d at 533. Similarly, the scènes-à-faire doctrine excludes from protection "expressions that are standard, stock or common to a

---

[58]Section 102(b) states: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

particular subject matter or are dictated by external factors," including "industry demand and practice." Eng'g Dynamics, 26 F.3d at 1344, 1347.[59]

> **(ii)   The degree of similarity required to infringe depends on the amount of the author's original contribution to a particular work.**

Although a work may be copyrightable as a whole, the scope of protection afforded that work varies in proportion to the amount of the author's original contribution.  "Many copyrights represent significant creative effort, and are therefore reasonably robust, whereas others reflect only scant creativity."  Nimmer, § 13.03[A][4], at 13-66.2.  "More similarity is required when less protectible matter is at issue."  Id.  Thus, "the scope of copyright protection [is] a sliding scale that changes with the availability of expressions for a given idea."  Eng'g Dynamics, 26 F.3d at 1348 (citing Lotus Dev. Corp. v. Borland Int'l, Inc., 831 F. Supp. 202, 209 (D. Mass. 1993)).

> If there's a wide range of expression (for example, there are gazillions of ways to make an aliens-attack movie), then copyright protection is "broad" and a work will infringe if it's "substantially similar" to the copyrighted work. If there's only a narrow range of expression (for example, there are only so many ways to paint a red bouncy ball on blank canvas), then copyright protection is "thin" and a work must be "virtually identical" to infringe.

———————————————

[59]The specific application of these doctrines to architectural works is discussed in subsection iii, below.

Mattel, Inc. v. MGA Entm't, Inc., 616 F.3d 904, 913-14 (9th Cir. 2010). "This heightened showing is necessary because, as idea and expression merge, fewer and fewer aspects of a work embody a unique and creative expression of the idea; a copyright holder must then prove substantial similarity to those few aspects of the work that are expression not required by the idea." Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 36 (1st Cir. 2001) (internal quotation marks and citation omitted).

Similarly, "[t]he law is more protective of highly original and highly expressive works than it is of functional and nonfiction works." Eng'g Dynamics, 26 F.3d at 1348.  To the extent that a work is "highly functional" or comprised of "highly standardized" elements it "may lie very near the line of uncopyrightability." See id.  Copyright protection in such works is thin.  See id. n.15. "Where the quantum of originality is slight and the resulting copyright is 'thin,' infringement will be established only by very close copying because the majority of the work is unprotectable." Beaudin v. Ben & Jerry's Homemade, Inc., 95 F.3d 1, 2 (2d Cir. 1996).

The same range of originality is present in architectural works: "Some architectural designs, like that of a single-room log cabin, will consist solely of standard features arranged in standard ways; others, like the Guggenheim, will include standard features, but also present something entirely new.  Architecture,

in this regard, is like every art form." <u>Zalewski</u>, 754 F.3d at 103-04.

Perry argues that a heightened standard of similarity should apply in all architectural cases. Perry cites the Eleventh Circuit's decision in <u>Intervest</u> for the proposition that "architectural works are entitled to 'the least, narrowest or 'thinnest' protection.'"[60] See <u>Intervest Const., Inc. v. Canterbury Estate Homes</u>, 554 F.3d 914, 921 (11th Cir. 2008). The court in <u>Intervest</u> reached this conclusion by likening architectural works to compilations, <u>see id.</u>, which, following the Supreme Court's opinion in <u>Feist</u>, are entitled to only thin protection, 111 S. Ct. at 1289. However, Congress anticipated this argument when it amended the Copyright Act to include architectural works, and it rejected any heightened standard of similarity:

> [D]eterminations of infringement of architectural works are to be made according to the same standard applicable to all other forms of protected subject matter. The references in the definition of "architectural work" to "overall form," and to the nonprotectibility of "individual standard features" are not intended to indicate that a higher standard of similarity is required to prove infringement of an architectural work, or that the scope of protection of architectural works is limited to verbatim or near-verbatim copying. These definitional provisions are intended merely to give the courts some guidance regarding the nature of the protected matter. <u>The extent of protection is to be made on an ad hoc basis.</u>

---

[60]Defendant's Motion for Summary Judgment, Docket Entry No. 22, p. 26 ¶ 52.

H.R. Rep. No. 101-735, reprinted in 1990 U.S.C.C.A.N. 6935, 6952 (emphasis added). "Intervest contravenes Congress' intent by treating architectural works differently than other works and failing to determine what in architecture -- beyond mere arrangement -- is copyrightable." Zalewski, 754 F.3d at 104. The "real issue" is "to determine what in [the work] originated with the author and what did not." Id. Where the author's original contribution is "slight," his copyright may be "very thin," id. at 107, but this is a function of the author's minimal contributions to the design at issue, not of architectural works in general, see id. This approach is consistent with general copyright principles and Fifth Circuit precedent.

The scope of protection for Lennar's works, and the level of similarity required for infringement, will depend on the amount of Lennar's original contribution to those works. After applying "standard 'copyrightability filters,' such as scènes-à-faire," the "court will determine whether the [potentially] thin copyright [Lennar] may enjoy has been infringed." See Eng'g Dynamics, 26 F.3d at 1348 n.15.

### (iii) Filtration is compatible with architectural works being protectable "as a whole."

Lennar argues that what is protectable, and what Perry infringed, is "the layout of its floor plans as a 'protectible whole,' including as to the selection, arrangement, and integration

of elements and spaces, as well as their overall form, look, concept, and feel."[61]  Lennar argues that "[b]ecause [its] layouts are protectable as a whole and in overall concept and feel, regardless of the protectability of the components, the Court's substantial similarity analysis does not require the 'filtering out' of purportedly unprotectable elements."[62]

That architectural works are protectable "as a whole" is supported by the text of the Copyright Act and the legislative history.  See § 101 ("[An architectural work] includes the overall form as well as the arrangement and composition of spaces and elements in the design."); H.R. Rep. No. 101-735, reprinted in 1990 U.S.C.C.A.N. 6935, 6949 ("[Creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole.").

Lennar cites several district court cases finding substantial similarity in architectural works based solely on a comparison of the plans as a whole.[63]   However, the courts' finding of

---

[61]Plaintiff's Supplemental Brief on Substantial Similarity, Docket Entry No. 75, p. 8.

[62]Id. at 6.  Specifically, "Lennar does not seek protection, nor allege infringement, of any individual standard features, elements, or spaces within its designs."  Id. at 8.

[63]See Cornerstone Home Builders, Inc. v. McAllister, 303 F. Supp. 2d 1317, 1321 (M.D. Fla. 2004) (concluding that Defendant's home infringed the look and feel of plaintiff's design despite several notable changes); Wood v. B L Bldg. Co., No. H-03-713, 2004 WL 5866352, at *9 (S.D. Tex. June 22, 2004) (continued...)

"substantial similarity" in those cases is conclusory, and in some instances collapses probative similarity and substantial similarity into a single analysis.  That is not the law in this circuit.  More importantly, however, there is no indication in those cases that the courts considered scope of protection or protectability of particular elements.  Therefore, those cases are not particularly useful in addressing Perry's arguments.

Lennar also points to some district court cases that have eschewed a filtration analysis when dealing with architectural works.[64]  However, the procedural posture and/or issues addressed

---

[63] (...continued)
("Although the plans have minor differences-such as the size of certain rooms and the configuration of the breakfast nook area -- the rest of the plans are essentially identical."); Richmond Homes Mgmt., Inc. v. Raintree, Inc., 862 F. Supp. 1517, 1527 (W.D. Va. 1994), aff'd in part, rev'd in part on other grounds, 66 F.3d 316 (4th Cir. 1995) (finding substantial similarity where "interior layouts [were] nearly identical except for minor differences in dimension"); Ronald Mayotte & Associates v. MGC Bldg. Co., 885 F. Supp. 148 (E.D. Mich. 1994) (same).  Notably, Mayotte implies that were the plans at issue more constrained, the similarities might not be actionable:  "Unlike the log-cabin houses in Howard, supra, whose unavoidable 90-degree angles severely limited how they could be designed, the large suburban houses at issue here share striking but avoidable resemblances."  Id. (emphasis added).  The court's emphasis on "avoidable" resemblances, however, might signal a focus on factual copying.

[64] See Frank Betz Assocs., Inc. v. J.O. Clark Const., L.L.C., No. 3:08-CV-159, 2010 WL 4628203, at *1 (M.D. Tenn. Nov. 5, 2010) (denying defendant's motion for separate trials on protectability of individual elements (bench trial) and infringement (jury trial) because jury would still consider overall arrangement of unprotectable elements as protectable whole); Frank Betz Associates, Inc. v. Signature Homes, Inc., No. 3:06-0911, 2010 WL 1373268, at *5 (M.D. Tenn. Mar. 29, 2010) (denying defendant's
(continued...)

in those cases differ from the motion under consideration. Furthermore, as with Lennar's other authorities, it does not appear that those courts considered the types of constraints at issue in this case.

What Lennar's argument highlights, however, is the tension between "filtration" on the one hand, and two related concepts on the other: (1) some courts' consideration of "total concept and

---

[64] (...continued)
motion for summary judgment on "functionality" because "[a]lthough comprised of functional elements, the Betz designs [as a whole] do not rise to the level of functionality such that copyright protection cannot be extended to them"); Dorchen/Martin Associates, Inc. v. Brook of Boyne City, Inc., No. 13-CV-10588, 2013 WL 5348627, at *7 (E.D. Mich. Sept. 24, 2013) (holding that, in response to interrogatories, plaintiff "is not required to state each and every original element because it is asserting that the overall arrangement of the functional spaces is protected"); Design Basics, L.L.C. v. DeShano Companies, Inc., 10-14419, 2012 WL 4321313, at *6 (E.D. Mich. Sept. 21, 2012) (denying defendant's motion for summary judgment on originality because "architectural plans, as a whole, can constitute an original work")

feel" in their substantial similarity analysis,[65] and (2) the protectability of architectural works "as a whole."

The D.C. Circuit's opinion in <u>Sturdza v. United Arab Emirates</u> highlights this tension.   <u>See</u> 281 F.3d 1287 (D.C. Cir. 2002). <u>Sturdza</u> involved a design competition for a "multi-use facility expressing the richness and variety of traditional Arab motifs." <u>Id.</u> at 1292.   The plaintiff accused the defendant of copying her submission; the district court granted summary judgment for the defendant.   The district court first "filtered out" those elements of the plaintiff's design it viewed as unprotectable ideas: domes, wind-towers, parapets, arches, and decorative patterns.   <u>Id.</u> at 1297.   Then, proceeding item by item, the court compared how the <u>concepts</u> of domes, wind-towers, etc., were <u>expressed</u> in the two

---

[65]The Second Circuit provides a detailed description in <u>Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.</u>, 338 F.3d 127, 134 (2d Cir. 2003).

> Essentially, the total-concept-and-feel locution functions as a reminder that, while the infringement analysis must *begin* by dissecting the copyrighted work into its component parts in order to clarify precisely what is not original, infringement analysis is not *simply* a matter of ascertaining similarity between components viewed in isolation.   For the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art . . . are considered in relation to one another.

Courts sometimes also refer to this as "overall look and feel." <u>See, e.g.</u>, <u>Stromback v. New Line Cinema</u>, 384 F.3d 283, 297 (6th Cir. 2004).

-44-

designs.  At the level of protectable expression, it concluded, the designs were decidedly different.  Id. at 1297.  That is to say, the general use of domes, wind-towers, etc., was not itself protectable, and the specific domes, wind-towers, etc., that were used differed between the two designs.

On appeal, the D.C. Circuit reversed.  The court agreed that the first step in the analysis is to exclude unprotectable elements such as ideas and scènes-à-faire.  Id. at 1296.  However, it stated that "[t]he substantial similarity determination requires comparison not only of the two works' individual elements in isolation, but also of their 'overall look and feel.'"  Id. (citing Boisson v. Banian, Ltd, 273 F.3d 262, 272 (2d Cir. 2001)). "Considering the works as a whole is particularly important because protectible expression may arise through the ways in which artists combine even unprotectible elements."  Id.  Turning to the designs at issue, the court found that "[t]he size, shape, and placement of [the defendant's] wind-towers, parapets, and pointed domes . . . give his building a contour virtually identical to [the plaintiff's,] [c]ontributing to the similarity in overall look and feel."  Id. at 1299.  A jury might therefore find that the designs were substantially similar.  Id.

Notably, however, this court finds no indication in the Sturdza opinion that the D.C. Circuit considered any arguments similar to Perry's in this case.  The designs at issue in Sturdza

were large multi-use complexes, and the only restraints identified pertained to individual features typical in Arab architecture, not the overall arrangement of those features.

The Second Circuit's opinion in Zalewski is more on point, and it demonstrates how filtration is compatible with consideration of the overall layout of an architectural work. The plaintiff in Zalewski alleged that the defendants "copied the overall size, shape, and silhouette of his designs as well as the placement of rooms, windows, doors, closets, stairs, and other architectural features." 754 F.3d at 99. The district court granted summary judgment for the defendants, and the plaintiff appealed.

In affirming the district court's ruling, the Second Circuit explained how the merger and *scènes-à-faire* doctrines should apply to architectural works. First, regulations and other external factors may narrow the range of design options such that only a limited number of designs are workable. See id. at 105. Therefore, "[a]ny design elements attributable to building codes, topography, structures that already exist on the construction site, or engineering necessity . . . get no protection." Id. Second, *scènes-à-faire* in architecture includes standard house designs and market expectations. See id. at 105-06. Therefore, "[d]esign features used by all architects, because of consumer demand, also get no protection." Id. at 105.

-46-

The court then applied these principles to the layout and arrangement of the plaintiff's house and made several relevant determinations: (a) "[T]he overall footprint of the house and the size of the rooms are 'design parameters' dictated by consumer preferences and the lot the house will occupy, not the architect"; (b) the "general layout" and the "location, size, and general design" of individual elements were attributable to the house's "colonial archetype"; and (c) "[t]here are only so many ways to arrange four bedrooms upstairs and a kitchen, dining room, living room, and study downstairs." See id. at 107.

The court concluded that "although there is certainly something of Plaintiff's own expression in his work, as long as Plaintiff adhered to a pre-existing style his original contribution was slight -- his copyright very thin." Id. That is, by applying the scènes-à-faire and merger doctrines to the plaintiff's overall design, the court in Zalewski identified those aspects that were determined by external factors -- the house's "general layout" -- the amount of the author's original contribution -- "slight" -- and the corresponding scope of protection in his work -- "thin." Because that scope was thin, "only very close copying would have taken whatever actually belonged to Plaintiff." Id. The defendants' designs, which shared the plaintiff's "general layout" but differed in the "exact" placement, size, and arrangement of individual elements, "copied only the unprotected elements of [the

plaintiff's] designs." Id. at 106-07.   Therefore the defendants'
designs did not infringe, and summary judgment was appropriate.[66]

The court is not persuaded that it should -- or, in light of
Nola Spice, can -- forego some form of filtration analysis in this
case.   Nevertheless, the court is mindful that because an
architectural work may consist of a protectable arrangement of
unprotectable elements, filtration in architectural cases cannot
involve the mere elimination of individual elements.[67]   However,
unlike in Sturdza, where the court found potential infringement of
the overall arrangement despite the defendant's challenge to
individual elements, Lennar's overall arrangement of spaces is
itself an element Perry challenges as being unprotectable.   Put
another way, even considering the overall look and feel of Lennar's
plans -- the "protectable whole" -- that overall look and feel is
primarily a function of design choices Perry contends are

_____

[66]The plans at issue in Zalewski were not published with the
opinion.   Notably, however, the court in Zalewski stated that it
agreed with the outcome in Intervest -- no infringement -- just not
the reasoning.   See Zalewski, 745 F.3d at 103.   A cursory glance at
the plans at issue in Intervest reveals just how similar a copy may
be without infringing a thin copyright.   See 554 F.3d at 922.

[67]The Fifth Circuit has not expressly adopted the total-
concept-and-feel test.   But see Positive Black Talk, 394 F.3d at
373-74.   Nevertheless, in light of statutory text and legislative
history, consideration of works "as a whole" is clearly appropriate
in architectural cases.   See also Eng'g Dynamics, 46 F.3d at 410
("[S]ubstantial similarity may be measured by comparing the
products as a whole."); Eng'g Dynamics, 26 F.3d at 1348 n.15
("After applying other more standard 'copyrightability filters,'
such as scenes a faire, the district court will determine whether
the thin copyright EDI may enjoy has been infringed.").

unprotectable.   As in <u>Zalewski</u>, the court can filter out those aspects of Lennar's overall designs that were influenced by external factors and determine the scope of protection in Lennar's plans.   Therefore, a filtration analysis is not only required, it is also entirely compatible with an analysis of Lennar's designs as a "protectable whole."

### (iv)   Application to the plans at issue.[68]

Perry has conducted an exhaustive -- and persuasive -- analysis of each of the individual elements of Lennar's designs that it contends are not protected.[69]   Ultimately, however, "Lennar does not seek protection, nor allege infringement of, any individual standard features, elements, or spaces within its designs."[70]   Lennar only claims protection for and infringement of "the overall layout of the plans as a 'protectible whole.'"[71]

----

[68]Copies of the relevant plans are attached to this opinion as an appendix.

[69]<u>See</u> Defendant's Additional Briefing on Non-Protected Elements, Docket Entry No. 72, pp. 9-18.

[70]Plaintiff's Supplemental Brief on Substantial Similarity, Docket Entry No. 75, p. 3.

[71]<u>Id.</u>; <u>see also</u> <u>id.</u> at 5 ("Because Lennar does not allege infringement of any individual components of its designs, but rather its floor plan layouts as a 'protectible whole,' the Court need not consider the protectibility of any individual elements via a filtration analysis."); Lennar's Motion for Leave and Response to Perry's Supplemental Brief, Docket Entry No. 84, pp. 10-11 ("In the present case, even if individual elements of the plans (e.g., the doors, windows, bedrooms, stairs) are . . . not individually
(continued...)

Therefore, the court's analysis will focus on those aspects of Lennar's overall arrangement that are properly excluded from consideration.[72]

Before proceeding further, however, a key distinction between Perry's and Lennar's arguments is relevant. Perry argues that because of the tight constraints of the Woodlands Development Criteria and market demands, there were a limited number of ways to arrange the plans at issue in this case. Therefore, Perry argues, Lennar's overall arrangement should get no protection. Otherwise, Lennar would have a monopoly on marketable designs in the Woodlands. Lennar argues in its briefing, and its expert opines in his report, that there were numerous ways to arrange these elements and still comply with the Development Criteria and market demands. The primary conclusion Lennar and its expert appear to draw from this premise, however, is that <u>Perry's</u> architect was not so

---

[71](...continued)
protectible, the manner in which they are selected, arranged, and expressed as a whole is protectible and must be compared.").

[72]Relevant or not, however, the Court is persuaded by Perry's arguments as to the individual elements it claims are unprotectable. Further, in its late-filed brief, Lennar appears to argue that even if the elements are individually unprotected, the "expression or expressive combination" of those elements is itself protected. <u>See</u> Docket Entry No. 84, p. 10 & n.25. As discussed below, notwithstanding Perry's incorporation of many of the same individual elements in the same general layout, the expression of those individual elements, and the precise details of their layout, differ significantly between Lennar's and Perry's designs. Whatever copyright protection Lennar has in the expression or expressive combination of those individual elements has not been infringed.

constrained that the similarity of the designs was inevitable, i.e., this was no accident. Compelling as that argument may be with respect to factual copying, that is not the issue here.[73] At issue is whether <u>Lennar's</u> designer was sufficiently constrained that aspects of <u>Lennar's</u> plans are unprotectable for purposes of establishing substantial similarity. The relevant constraints need not be absolute. They need only narrow the range of available expression such that protecting certain aspects of Lennar's works would grant Lennar an impermissible monopoly on designs that meet those constraints.[74]

The Woodlands Development Criteria contain the following provisions relevant to the layout of the Burgundy and Bordeaux:[75]

---

[73]To the extent that alternative design options are relevant to the substantial similarity inquiry as well, the court considers them below.

[74]<u>See, e.g.</u>, <u>Kepner-Tregoe</u>, 12 F.3d at 533 ("[W]hen an idea can be expressed in very few ways, copyright law does not protect that expression, because doing so would confer a de facto monopoly over the idea."); <u>Kern River Gas</u>, 899 F.2d at 1463 ("The guiding consideration in drawing the line between an idea and its expression is the preservation of the balance between competition and protection reflected in the patent and copyright laws." (internal quotation marks, alteration, and citation omitted)).

[75]Development Criteria, Exhibit C to Defendant's Additional Briefing on Non-Protected Elements, Docket Entry No. 72-3.

- Houses shall be a duplex product,[76] between 1800 and 2200 square feet,[77] not to exceed two stories.[78]

- Typical lot sizes for single family attached duplex units are 35' x 90', with minimum setbacks of 20' in the front, 5' on the side, and 15' in the rear.[79] The sum total of all hard surfaces -- i.e., the building pad, driveway, garage, and patios -- shall not exceed 70% of the total lot.[80]

- The front elevation of each residence must face the street,[81] and it must include a garage for at least two cars, also facing the street.[82]

In its response to Perry's interrogatories, Lennar stated that "[m]arket demands and consumer preferences that may have influenced Plaintiff's design include spacious master suite; numerous windows in the master suite; large master bathroom; and separate shower and tub in the master bathroom."[83]

---

[76]Id. at 2.

[77]Id. at 4.

[78]Id.

[79]Id. at 1, 3.

[80]Id. at 3.

[81]Id. at 4.

[82]Id. at 7.

[83]Plaintiff's Response to Defendant's Second Set of Interrogatories, Exhibit F to Defendant's Additional Briefing on Non-Protected Elements, Docket Entry No. 72-6, p. 3.

Most relevant, however, is the deposition testimony of Lennar's designer, who conceded each of the following points regarding constraints on designs like the Burgundy and Bordeaux:[84]

- A lot of the layout of a home is dictated by the lot size.[85] The size of a lot influences the total number of bedrooms, how large the den is, whether there is a separate sitting room, whether there is a separate kitchen, and features can be constrained as the lot size gets smaller.[86]

- An average double garage door is 16-feet wide, meaning the garage as a whole is about 20-feet wide. On a 35-foot wide lot with a 5-foot setback that leaves 10 feet, laterally, in which to position the front door to the house.[87]

- Behind the front door is going to be a hallway. Inside, there has to be a kitchen somewhere.[88] In a two-story townhome, there is a consumer preference to have the kitchen as well as the primary living area on the first floor. If the kitchen is on the first floor, any breakfast area has to be on the first floor as well.[89] The breakfast area is typically adjacent to the kitchen.[90]

---

[84]See Oral and Videotaped Deposition of Sam Teuton ("Teuton Deposition"), Exhibit B to Defendant's Additional Briefing on Non-Protected Elements, Docket Entry No 72-2. Nearly all of these propositions were offered to Mr. Teuton by Perry's attorney. Mr. Teuton's agreement with each, however, was clear and unequivocal.

[85]Id. at 12-13.

[86]Id. at 6.

[87]Id. at 9-10.

[88]Id. at 10.

[89]Id. at 18.

[90]Id. at 11.

- It is uncommon that the downstairs bathroom opens into the kitchen.[91]  Most people don't want the bathroom in the kitchen or the den, so it really has to go in the hallway.[92]

- Buyers of new construction homes today demand a fairly luxurious and large master bathroom.  Buyers expect the master bath to be physically connected to the master bedroom.  The master bedroom must have master closets.[93]

- Bedrooms need windows.  Because duplex plans have a common wall on which there can be no windows, bedrooms must be positioned along one of the three exterior walls.[94]  Secondary bedrooms therefore can only go in the front left, front right, back left, or back right side the plan.  No bedroom can go in the middle of the shared wall.[95]

- If the plan has a secondary bathroom servicing the secondary bedrooms, the secondary bathroom needs to be in reasonable proximity to the secondary bedrooms.[96]

Despite Perry's heavy reliance on Lennar's designer's deposition testimony, Lennar does not address that testimony in either its Brief on Substantial Similarity or its Response to Perry's Supplemental Brief.  Lennar instead relies on the report of its expert, and on numerous plans by Lennar, Perry, and third-party

---

[91] Id.

[92] Id. at 11-12.

[93] Id. at 4.

[94] Id. at 5.

[95] Id. at 16-17.

[96] Id. at 4.

builders, that either (a) do not conform to the market constraints
alleged by Perry or (b) employ different layouts despite having lot
sizes and square footage roughly equivalent to the plans at issue
in this case.[97]

Lennar's expert opines that "there is no basis for the
contention that development guidelines or market preferences would
necessarily lead to constricted design possibilities."[98]   As
discussed above, however, the thrust of Lennar's expert report is
that Perry's architect was not so constrained in his design that he
inadvertently drew the same plans as Lennar.[99]   This is
distinguishable from the key issue here, whether Lennar's designer
was so constrained in his general layout that either (a) it was not
original to him, or (b) what choices he did have were so limited
that they cannot be protected by copyright.   Lennar's designer
conceded in his deposition that the general layouts of the Burgundy
and Bordeaux were significantly constrained by the lot size and
market demands.   While the court does not agree with Perry's

---

[97]See Plaintiff's Supplemental Brief on Substantial Similarity,
Docket Entry No. 75, pp. 11-17.

[98]Report on Design Originality and Similarity, Exhibit 39-B to
Plaintiff's Response, Docket Entry No. 34-9, p. 13.

[99]See, e.g., id. at 14 ("[G]iven the existence of several other
home designs and their illustrated congruence with the Creekside
home parameters, there is no compelling support or credence to the
suggestion that the works in question here are similar due to
development guidelines or market preferences." (emphasis added));
id. at 13 ("[S]uch market preferences could have easily been
adopted post hoc after the copyright issue arose.").

contention that Lennar's layouts were "the only way" to comply with external constraints,[100] Lennar's options were limited, and its layouts represent some of only a few that would be both marketable and compliant with the Development Criteria.[101]  Lennar's evidence of design alternatives, while relevant to factual copying, is not dispositive of the protectability issue for purposes of substantial similarity.

In response to Perry's interrogatories, Lennar claimed that the following elements of the Burgundy and Bordeaux plans are protected by copyright:   (1)  "[t]he  size  and  dimensions,"

---

[100]See Defendant's Motion for Summary Judgment, Docket Entry No. 22, pp. 17-18 ¶ 31.

[101]The Director of Lennar's Houston division, Donald A. Luke, testified that the Woodlands designed the home sites in Phase I based on the immediate predecessors of the Burgundy and Bordeaux, the Village Builder Villas.   Luke Deposition, Docket Entry No. 34-1, pp. 116-18.   The Villas appear to have had the same footprint and general layout as the Burgundy and Bordeaux.  Docket Entry No. 17, p. 4 ¶ 17.   Neither party has addressed the legal implications of this fact.  If true, however, it would suggest that Lennar's designs were not constrained by the Development Criteria per se, but instead by the footprint and square footage Lennar itself chose to use.   In the end, whether the Development Criteria are based on Lennar's plans or Lennar's plans are based on the Development Criteria is a distinction without a difference.   The constraints of building an 1800-2200 square foot, 30-foot wide, two-story duplex with an attached two-car garage are the same whether they are externally mandated or self-imposed.   See Zalewski, 754 F.3d at 107 ("So long as Plaintiff adhered to a pre-existing style his original contribution was slight -- his copyright very thin."); id. at 6 ("[T]he overall footprint of the house and the size of the rooms are 'design parameters' dictated by consumer preferences and the lot the house will occupy, not the architect.").

(2) "[t]he arrangement and composition of spaces and elements," and

(3) "[t]he overall form, look and feel."[102]

As demonstrated by the evidence above, the size and dimensions of Lennar's plans were primarily determined by the lot size and market conditions.  Whether size and dimensions are copyrightable at all is unclear, but they certainly are not protectable in this case.  Similarly, the evidence shows that the general layout of Lennar's plans -- i.e., the positioning of rooms and spaces relative to one another -- was sufficiently constrained to be unprotectable.  Nevertheless, the evidence does not suggest that the precise arrangement and composition of spaces and elements -- i.e., the exact placement, size, and arrangement of individual features -- was significantly pre-determined.  It may therefore be protectable.[103]  However, to the extent that the "overall form, look

---

[102]Plaintiff's Response to Defendant's First Set of Interrogatories, Exhibit A to Defendant's Additional Briefing on Non-Protected Elements, Docket Entry No. 72-1, pp. 3-4.

[103]However, the "selection" of individual elements -- at least those visible in the floor plans and discussed in the briefs -- is unprotectable in this case.  Lennar argues that Perry takes the inclusion of a breakfast nook, patio, two-story entryway, etc., as a given, but that Perry and other builders often forgo these features.  Plaintiff's Supplemental Brief on Substantial Similarity, Docket Entry No. 75, pp. 12-13, 14-15.  This argument is a non-starter.  While it might be relevant to factual copying, it is irrelevant to whether Lennar's inclusion of these features is protectable.  Lennar does not argue that patios, breakfast nooks, or two-story entries are elements original to Lennar, or even that the combination of those elements is original to Lennar.  None of these elements is particularly unique, and Lennar cannot have a monopoly on their use, even in combination with one another.

and feel" of Lennar's plans is a function of the general layout, it too is unprotectable.

Because the available arrangements for Lennar's designs were so limited, Lennar's original contributions were slight, and its copyright is thin. Because Lennar's copyright is thin, only near-verbatim copying by Perry would infringe. Nevertheless, such an analysis can be hard to apply, since even verbatim copying must still appropriate protected elements to be legally actionable.[104] A more precise formulation is to say that for Perry's plans to infringe, they must be substantially similar to whatever protectable elements remain after Lennar's general layouts are excluded. Under either formulation, however, if the only similarities between the parties' plans pertain to unprotected elements -- i.e., the general layout -- then Perry has not copied any protectable material, its plans do not infringe, and summary judgment is appropriate.

Comparing Lennar's Burgundy to Perry's 2249 -- Beginning with the first floor, both designs share the following: a two car garage with a porte-cochere; a front porch and front door; a front foyer and hallway with stairs and a half bath; an open-plan family room,

---

[104]An extreme example:  If 95% of a work is unprotectable, then verbatim copying of that 95% would not infringe, even if it constitutes near-verbatim copying of the entire work.

kitchen, and breakfast/morning area; and a covered patio.[105]   Each of these elements is in the same general location in each plan. However, beyond the general layout of these spaces, the plans differ significantly:   First, none of the dimensions of these spaces -- where identified -- are the same, and the overall square footage of each plan is different.   Second, the configuration of elements within these spaces differs between the plans.   Starting with the entryway, Lennar's door is on the right side of the porch, and upon entering one encounters a five-foot wide hallway running along the side of the staircase, which ascends from the rear of the house toward the front.   Perry's 2249 has the door in the middle of the porch, and upon entering one encounters an open area at the

---

[105]In support of its Supplemental Brief on Substantial Similarity, Docket Entry No. 75, Lennar has attached as exhibits comparisons of the Lennar and Perry plans -- one for the Burgundy and one for the Bordeaux -- excerpted from Lennar's expert's report.   See Exhibits A and B (filed under seal); see also Docket Entry No. 34-9, pp. 21, 34 (filed with expert's report).   However, there appear to be at least four distinct versions of the Lennar Burgundy: the 2291A, 2291C, 2291E, and 2291G.   See Exhibits to Second Amended Complaint, Docket Entry No. 17-1, pp. 10-13 (providing floor plans of each model).   The first floor of each Burgundy plan appears identical, with minor variations in the listed dimensions of the kitchen, garage, and porch.   The only notable differences between the second floors of each Burgundy plan appear to be in the precise shape and dimensions of the master bedroom, whether it has a balcony, and whether the windows extend out from the front of the room or are flush with the exterior wall. Lennar's briefing and infringement allegations do not distinguish between the different versions of the Burgundy.   The comparison provided in Lennar's expert report appears to be between the Perry 2249 and the Burgundy 2291G.   See Docket Entry No. 34-9, p. 21. Even comparing Perry's 2249 to the three other Burgundy plans in Lennar's Second Amended Complaint, the court's conclusions are the same.

base of the stairway, which ascends from the front of the house toward the rear. The entryway in each plan contains an area that is two stories tall, but because the stairways are reversed, the location and shape of the area open to the second floor differs in each plan. Both plans have a half bath under the stairs, but in different locations. Lennar's plan has no door from the front hall into the garage; Perry's does.

The open-plan area at the rear of each model is L-shaped, with the family room, kitchen, and breakfast/morning area in the same location. However, not only are the dimensions of these spaces different, the configuration of elements within these spaces differs as well. Lennar's kitchen has a doorway to the garage at the front and a single counter along the right-side wall. Perry's plan has a larger L-shaped counter, no door to the garage, and a closet, pantry, range, and (what appears to be) refrigerator in different locations from those in the Lennar plan. The breakfast or morning area in each plan is an open box with windows and a door to the covered patio, but the doorways are different, and Lennar's patio is flush with the rear of the house while Perry's extends out into the yard.

Moving to the second floor, each plan has a "library" or "game room," master bedroom, master bath, walk-in closet, utility room, two secondary bedrooms, and a secondary bath, all in the same general location. However, beyond the general layout of these

-60-

spaces, the plans again differ significantly: Lennar's stairs lead
to a wrap-around hallway over the foyer, whereas Perry's stairs
face the other direction and lead directly into the library.  The
entrance to the master bedroom is in a different place in each
plan, and while each master bedroom is connected to the master
bath, the layouts of the master baths differ, and Perry's master
bath has an extra closet.  The utility rooms and walk-in closets
are in the same place, but they are configured differently, and
Perry's are interconnected, whereas Lennar's each have only one
door.  The closets in the secondary bedrooms are different, as is
the placement of the doors.  The secondary baths are configured the
same, but they are in different places.  If Perry's 2249 copies
anything from Lennar's Burgundy, it is the unprotected general
layout.

Comparing Lennar's Bordeaux to Perry's 2255 -- Most notably,
Perry's 2255 is at least 400 square feet larger than either version
of the Bordeaux.[106]  Nevertheless, the two plans contain most of the

---

[106]The comparison of the Bordeaux and 2255 plans provided with
Lennar's supplemental briefing, and attached to its expert report,
see Docket Entry No. 34-9, p. 34, has thick-lined boxes
superimposed over individual areas.  These boxes do not appear in
the plans attached to Lennar's Second Amended Complaint, Docket
Entry No. 17-1, pp. 14-16, and they obscure the precise layouts of
the two plans.  The court has relied on the plans in Lennar's
Second Amended Complaint. As with the Burgundy, there are at least
two versions of the Bordeaux, the 2271H and 2271F.  The first floor
of each appears identical, with minor variations in the dimensions
of the garage.  The only notable differences in the second floors
are that the 2271F has a balcony over the front porch and the
(continued...)

same rooms and spaces in similar locations.  Beyond that, however, even aspects of the general layouts differ:  Beginning on the first floor, Lennar's front porch and entryway are recessed about ten or fifteen feet toward the middle of the plan; Perry's porch is nearly flush with the front of the garage.  Because of this, Lennar's entryway is shallow, with only a bathroom along the inside wall; Perry's is deeper, and in addition to a bathroom has a closet and a doorway into the garage.  Lennar's entryway is one floor tall; Perry's is open to the floor above.  Both plans have the stairway behind the garage, but otherwise the configuration of the family room, kitchen, morning area, and covered patio are the same as they were in the Burgundy and 2249, discussed above, including nearly all of the differences highlighted between those plans.

Moving to the second floor, Lennar's plan has no library; Perry's does.  Lennar's master bedroom has a balcony flush with the rear of the building; Perry's master bedroom has no balcony, protrudes from the rear of the building, and is a different shape overall.  The master baths are both in the top right corner, but they are arranged differently.  Both master baths are connected to an L-shaped walk-in closet, but Perry's L-shaped closet is more elongated, and it connects to the utility room.  Lennar's utility

---

[106] (...continued)
second and third bedrooms are smaller, front to back, by two feet and one foot, respectively.  The court's conclusions are the same regardless of which Bordeaux model is compared to Perry's 2255.

room abuts the staircase; Perry has the secondary bath in that location.  Both plans have two secondary bedrooms over the garage, but the closets are different, with Lennar's protruding into the room and Perry's flush with the wall.  It is questionable whether even the general layouts of these two plans are substantially similar.  The Perry 2255 design does not contain any protected elements of the Lennar Bordeaux.

### (v)    Summary judgment is appropriate.

Perry argues that "[i]t is Lennar's burden to prove as a matter of law that specific elements of its townhouses are protected by copyright," and that factual determinations in this regard are to be made by the court.[107]   Lennar argues that *scènes-à-faire* and merger are affirmative defenses on which Perry bares the burden of proof, and that in this case the application of each doctrine raises fact questions for the jury.[108]

With respect to Perry's arguments, the law is less than clear. Copyrightability of particular subject matter is, "in all instances" a matter for the judge.  Nimmer § 12.10[B], at 12-192; see <u>Pivot Point Intern., Inc. v. Charlene Products, Inc.</u>, 932 F. Supp. 220, 225 (N.D. Ill. 1996) (Easterbrook, J., sitting by

---

[107]Defendant's Additional Briefing on Non-Protected Elements, Docket Entry No. 72, pp. 7-8.

[108]Plaintiff's Supplemental Brief on Substantial Similarity, Docket Entry NO. 75, p. 10.

designation) ("Whether mannequin heads in general, or these mannequin heads in particular, are copyrightable is a question of law, which the court will decide (perhaps in response to dispositive motions soon to be filed). A jury has nothing to do with this subject."). However, "the question of originality usually is viewed as an issue of fact." <u>Noga</u>, 168 F.3d at 1291 n.14; <u>accord</u> Nimmer § 12.12, at 12-217; <u>but see</u> <u>Feist</u>, 111 S. Ct. at 1297 (concluding that alphabetical organization of telephone listings is "an age-old practice, firmly rooted in tradition" and therefore unoriginal as a matter of law). Not surprisingly, there is some split of authority on whether copyrightability "when it depends (as it usually does) on originality" is for the judge or the jury. <u>Gaiman v. McFarlane</u>, 360 F.3d 644, 648 (7th Cir. 2004).[109] Nevertheless, "authority . . . supports the view that to the extent that the defendant challenges the <u>quantum</u> of plaintiff's originality or creativity as a matter of law, or urges other such legal challenges to copyright subsistence, these matters should be resolved solely by the judge." <u>Nimmer</u>, § 12.10[B][2], at 12-194. "But threshold factual determinations in this regard, of course, are for the jury." <u>Id.</u>

---

[109]<u>Compare</u> <u>Matthew Bender & Co., Inc. v. West Pub. Co.</u>, 158 F.3d 674, 681 (2d Cir. 1998) ("[W]e treat the question of whether particular elements of a work demonstrate sufficient originality and creativity to warrant copyright protection as a question for the factfinder."), <u>with</u> <u>Gaiman</u>, 360 F.3d at 648 ("[C]opyrightability is always an issue of law.").

-64-

As to Lennar's argument, the law is also unsettled. <u>See</u> <u>Oracle America, Inc. v. Google Inc.</u>, 750 F.3d 1339, 1358 (Fed. Cir. 2014); <u>see</u> <u>generally</u> Nimmer §§ 13.03[B][3], [B][4]. Nevertheless, as <u>Nola Spice</u>, <u>Zalewski</u>, and other appellate opinions cited above demonstrate, regardless of which party bears the burden, it would appear proper at the summary judgment stage for courts to determine, based on an application of merger and *scènes-à-faire* to the evidence in the record, what aspects of a plaintiff's designs are protectable, and whether a defendant's designs infringe.

If Perry copied anything, it was the general layouts of Lennar's designs. Even if protectability of those layouts is an issue on which Perry has the burden, and even assuming that it is a factual matter for the jury to decide, and taking as correct Lennar's expert's opinion that there were numerous ways to lay out those plans that complied with the Development Criteria, the testimony of Lennar's designer -- along with the holdings in analogous cases -- is sufficient to show that Lennar's designs were so constrained by the lot size, duplex plan, and market demands, that Lennar's general layouts are unprotectable as a matter of law. Lennar cannot prove that Perry copied any protectable aspects of its plans, and summary judgment on Lennar's claims is appropriate.

### III. **Other Pending Motions**

Although Lennar filed its Motion for Leave and Response to Perry's Supplemental Brief (Docket Entry No. 84) two weeks after

the deadline for supplemental briefing, the court will grant that motion.  While this opinion does not thoroughly reference Lennar's brief, the court has considered it, and it does not change the court's conclusions.

Because the court will grant Perry's Motion for Summary Judgment, Perry's pending Motion to Strike Attorneys' Fees Experts (Docket Entry No. 30) is moot and will be denied.  Perry's pending Motion to Exclude the Testimony of Plaintiff's Designated Expert Leonard R. Bachman (Docket Entry No. 40) is also moot.  The court generally reserves judgment on the admissibility of expert testimony until trial.  Without ruling on the admissibility of Mr. Bachman's testimony, the court concludes that even if that testimony were admissible, it would not change the outcome in this case.

## IV.  **Attorney's Fees**

The Copyright Act gives courts discretion to award reasonable attorney's fees to a prevailing party.  <u>See</u> § 505.  Although Perry has not moved to recover attorney's fees, it has sought them in its answer.[110]  The court will therefore address the issue now so as to avoid any unnecessary motion practice.

---

[110]<u>See</u> Defendant's Original Answer to Plaintiff's Second Amended Complaint, Docket Entry No. 18, p. 7.

Generally, an award of attorney's fees to the prevailing party in a copyright action "is the rule rather than the exception." Virgin Records Am., Inc. v. Thompson, 512 F.3d 724, 726 (5th Cir. 2008) (internal quotation marks and citation omitted). "Nevertheless, recovery of attorney's fees is not automatic." Id. "[A]ttorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." Fogerty v. Fantasy, Inc., 114 S. Ct. 1023, 1033 (1994). There is no precise rule or formula that a district court must apply in determining whether to award attorney's fees. Id. at 1034. However, the Supreme Court has identified a non-exclusive list of factors that may be considered: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of a case) and the need in particular circumstances to advance considerations of compensation and deterrence." Id. at n.19 (internal quotation marks and citation omitted). Fifth Circuit precedent also suggests consideration of whether an award of attorney's fees would generally "promote[] the purposes of the Copyright Act." See Hunn v. Dan Wilson Homes, Inc., No. 13-11297, 2015 WL 3687674, at *12-13 (5th Cir. June 15, 2015).

Two points should be abundantly clear from the length and complexity of this opinion and the court's request for additional briefing from the parties: (1) Lennar's claims involve multiple

-67-

areas of unsettled law, and the outcome was by no means determinable ex ante. (2) Many of Perry's arguments ultimately lacked merit. Lennar's claims and its attorneys' legal positions were neither frivolous nor objectively unreasonable, and the court sees no compelling reason to compensate Perry or deter other parties in Lennar's position. Furthermore, given the close nature of the factual and legal questions at issue in this case and the substantial evidence of factual copying by Perry, penalizing Lennar would not promote the purposes of the copyright act. Each party will therefore be responsible for its own costs, including attorney's fees.

## V.  <u>Conclusions and Order</u>

The court concludes that any similarities between Lennar's copyrighted designs and Perry's allegedly infringing designs pertain to unprotectable elements of Lennar's designs. Perry's Motion for Summary Judgment (Docket Entry No. 22) is therefore **GRANTED**, and this action will be dismissed with prejudice. For the reasons stated above, Lennar's Motion for Leave and Response to Perry's Supplemental Brief (Docket Entry No. 84) is **GRANTED**, and Perry's Motion to Strike Attorneys' Fees Experts (Docket Entry No. 30) and Motion to Exclude the Testimony of Plaintiff's

Designated Expert Leonard R. Bachman (Docket Entry No. 40) are **DENIED AS MOOT.**[111]

    **SIGNED** at Houston, Texas, this 24th day of July, 2015.

                                            SIM LAKE
               UNITED STATES DISTRICT JUDGE

---

[111]The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motion. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

# APPENDIX

# Burgundy

### 3 Bedrooms | 2.5 Baths | 2-Car Garage | 2,083 Sq. Ft. Total





FIRST FLOOR PLAN                    SECOND FLOOR PLAN

*Vintage Villa Collection*
*Plan #2291G*

Plans and elevations are artist's renderings and may contain options, which are not standard on all models. Lennar reserves the right to make changes to these floor plans, specifications, dimensions and elevations without prior notice. Stated dimensions and square footage are approximate and should not be used as representation of the home's precise or actual size. Any statement, verbal or written, regarding "under air" or "finished area" or any other description or modifier of the square footage size of any home is a shorthand description of the manner in which the square footage was estimated and should not be construed to indicate certainty. Copyright ©2013 Lennar Corporation. Vintage Builders and the Village Builders logo are registered service marks of Lennar Corporation and/or its subsidiaries. 7/13



# DESIGNS

## Design 2249

*This home contains approximately 2,249 square feet.*





**This floor plan has a 10-foot plate on the first floor.**

*See Page 2 for Details and Disclaimers.
© Perry Homes, LLC 2012

01/22/2014
(Woodlands Duplex)

# PERRY HOMES

**EXHIBIT**
E

# *Bordeaux*

## *3 Bedrooms | 2.5 Baths | 2-Car Garage | 1,855 Sq. Ft. Total*



FIRST FLOOR PLAN



SECOND FLOOR PLAN

*Vintage Villa Collection*
*Plan#2271H*

Plans and elevations are artist's renderings and may contain options, which are not standard on all models. Lennar reserves the right to make changes to these floor plans, specifications, dimensions and elevations without prior notice. Stated dimensions and square footage are approximate and should not be used as representation of the home's precise or actual size. Any statement, verbal or written, regarding "under air" or "finished area" or any other description or modifier of the square footage size of any home is a standard description of the manner in which the square footage was estimated and should not be construed to indicate certainty. Copyright ©2013 Lennar Corporation. Village Builders and the Village Builders logo are registered service marks of Lennar Corporation and/or its subsidiaries. 7/13

# DESIGNS

## Design 2255

*This home contains approximately 2,255 square feet.* *





**This floor plan has a 10-foot plate on the first floor.**

*See Page 2 for Details and Disclosures.
© Perry Homes, LLC 2014
03/20/2014
(Woodlands Duplex)

# PERRY HOMES



EXHIBIT

G